# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Hartney Fuel Oil Co. v. Hamer*, 2012 IL App (3d) 110144

---

| | |
|---|---|
| Appellate Court Caption | HARTNEY FUEL OIL COMPANY, Plaintiff-Appellee, v. BRIAN A. HAMER, in His Official Capacity as Director, Department of Revenue; and DAN RUTHERFORD, in His Official Capacity as Treasurer of Illinois, Defendants-Appellants (The Board of Commissioners of Putnam County, and The Board of Trustees of the Village of Mark, Plaintiffs-Intervenors; Board of Trustees of the Village of Forest View, Illinois; County of Cook, and The Regional Transportation Authority, Defendants and Intervenors-Appellants). |
| District & No. | Third District<br>Docket Nos. 3-11-0144, 3-11-0151 cons. |
| Filed | September 17, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff's liability for state and local sales taxes on its sale of gasoline to gas stations and other distributors was fixed in Putnam County, the county where its sales operations were located and all daily and long-term purchase orders were "accepted," and no statutory authority prohibited plaintiff from structuring its sales procedures to minimize its tax liability by placing its sales operations in a county without local sales taxes. |
| Decision Under Review | Appeal from the Circuit Court of Putnam County, Nos. 2008-MR-11, 2008-MR-13, 2008-MR-15; the Hon. Scott A. Shore, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Timothy Bertschy (argued), Karen L. Kendall, Brad A. Elward, and Maura Yusof, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellant Regional Transportation Authority. |
| | Judith Kolman, of Rosenthal, Murphey, Coblentz & Donahue, of Chicago, for appellant Village of Forest View. |
| | Anita M. Alverez, State's Attorney, of Chicago (Allison C. Marshall, Assistant State's Attorney, of counsel), of Chicago, for appellant County of Cook. |
| | Lisa Madigan, Attorney General, of Chicago (Paul Berks (argued), Assistant Attorney General, of counsel), for appellant Department of Revenue. |
| | Charles K. Schafer, Robert N. Hochman (argued), and Scott J. Heyman, all of Sidley Austin, LLP, of Chicago, and Michael T. Reagan, of Law Offices of Michael T. Reagan, of Ottawa, for appellee Hartney Fuel Oil Company. |
| | James A. Mack, State's Attorney, of Hennepin, for Board of Commissioners of Putnam County. |
| | David A. Rolf and Todd M. Turner, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, and Douglas J. Schweickert, of Schweickert & Ganassin, of Peru, for Board of Trustees of Village of Mark. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. Presiding Justice Schmidt concurred in the judgment, with opinion. Justice Carter dissented, with opinion. |

**OPINION**

¶ 1    The underlying dispute arises as the result of an audit determination made by the Illinois Department of Revenue (IDOR) that sales of Hartney Fuel Oil Co. (Hartney) were subject to state and local sales taxes in Forest View in Cook County, Illinois, rather than being subject only to state sales tax (as there are no applicable local sales taxes) in Mark, Putnam

-2-

County, Illinois, during the subject audit period.[1]

¶ 2 Hartney, the Village of Mark and the County of Putnam (hereinafter referred to collectively as plaintiffs) sought declaratory and injunctive relief to (1) determine that the situs of Hartney's sales had been in Mark, (2) redirect the local share of collected state sales taxes to the Village of Mark and the County of Putnam, and (3), as to Hartney, provide relief from tax, penalties and interest assessed against Hartney, and return of sales taxes paid under protest and held in the State of Illinois's protest fund. After a bench trial, the trial court granted the requested relief. Defendants, Brian A Hamer and Dan Rutherford, in their official capacities, and the Village of Forest View, the County of Cook, and the Regional Transportation Authority (hereinafter referred to collectively as defendants), appeal from the trial court's judgment. We affirm.

¶ 3                                    FACTS
¶ 4                                   Hartney

¶ 5 Hartney is a fuel marketing company that purchases fuel oil from large fuel suppliers and sells it to customers such as railroads, trucking companies, gas stations and other fuel distributors. In or around 1985, Hartney moved its sales operations out of its headquarters in Cook County (Forest View) to Du Page County (Elmhurst) because the lower tax rates in Du Page County allowed it to offer competitive prices to customers. Hartney moved its sales office several other times over the ensuing years, finally locating it in Putnam County (Mark), in 2003. Hartney's headquarters, however, remained in Forest View until November 2008, when Hartney also moved its corporate and accounting staff to Mark.

¶ 6 Upon moving its sales operations to Mark, Hartney contracted with Putnam County Painting (Putnam Painting) to provide office space and personnel. The agreement named Putnam Painting to be its managing sales agent and to provide Hartney with a sales representative to receive, accept and process fuel purchase orders from Hartney customers. Hartney paid Putnam Painting $1,000 per month for personal sales services and for office space.

¶ 7 The owners of Hartney also owned Energy Transportation, Inc. (ETI), a separate corporation providing the services of a common carrier. During the relevant time frame, the two corporations (Hartney and ETI) shared corporate headquarters in Forest View, while Hartney maintained a separate designated sales office elsewhere. Peter Hartney was the

---

[1]While the State of Illinois's share of sales tax is the same 6.5% throughout the state regardless of situs, additional sales taxes totaling 2.5% are collected by IDOR on behalf of local home rule taxing districts including the Village of Forest View, the County of Cook, and the Regional Transportation Authority, each of which has authority to levy additional sales taxes against sales situated within its jurisdiction. As those taxing districts stand to receive the benefit of IDOR's audit findings, they have been permitted to intervene. Of the state's 6.5% tax, a small share inures to the benefit of local municipalities (village and county) to which sales are sourced, giving the Village of Mark and the County of Putnam standing to seek equitable relief in the case. Thus, they have also been allowed to intervene.

president of Hartney. Gary Hartney was the president of ETI. While Hartney moved its corporate and accounting staff to Mark in November 2008, ETI continued to operate from its sole offices in Forest View.

¶ 8　　Ever since Hartney first moved its sales operation out of its headquarters in Forest View in 1995, it has conducted its sales in the same manner. Those sales can be broken down into two main categories: (1) *ad hoc* sales made to established customers who, on any given day, call Hartney's sales office and place an order for a specific quantity of fuel oil to be delivered at a specific time and location (daily purchase orders), and (2) sales made to customers via long-term requirements contracts, with the terms of sale–such as price and location of delivery–established in advance (long-term purchase orders).

¶ 9　　　　　　　　　　　　　　　　Daily Purchase Orders

¶ 10　　With respect to *ad hoc* purchase orders, Hartney customers were informed nightly via facsimile or some other form of electronic communication of the next day's price for fuel oil. These customers also received similar solicitations from competing fuel marketers in the area. If a customer wished to purchase fuel from Hartney, the customer contacted its sales office to place the order. The customer provided the sales office with the type of fuel, the quantity, and the time and location where delivery was needed, as well as any special instructions. In a majority of circumstances, Hartney's sales agent in Mark accepted a customer's order on the spot,[2] and then arranged for delivery by contacting ETI.

¶ 11　　On rare occasions (principally where the customer had not previously passed a credit check or had been placed on credit hold), the sales agent in the Mark office would reject a customer's purchase order. The sales agent knew in advance which customers had been pre-approved or placed on credit hold, so it was not necessary for the agent to check with Hartney's headquarters to determine whether to accept or reject the orders.

¶ 12　　From the time an order was placed with the Mark sales office until a bill was prepared by Hartney's accounting staff, the sales agents (located in Mark) were the sole individuals involved in processing the order. Fuel deliveries were the responsibility of ETI, which had no ability to reject or otherwise affect Hartney's acceptance of that order.

¶ 13　　　　　　　　　　　　　　　　Long-Term Purchase Orders

¶ 14　　Long-term purchase orders were negotiated with customers by Peter Hartney. Peter generally signed the agreement first and then sent the agreement to the customer. The customer then signed the agreement and sent it back to the Mark sales office. If Peter had not signed the contract first, the customer mailed the partially executed agreement to the Mark sales office. Peter would then travel to the Mark sales office to sign the contract. The fully executed contract would then be mailed from the Mark sales office to the customer. The

---

　　　[2]In some small percentage of cases, Hartney's sales agent in Mark would first check with ETI to see when delivery could be made and confirm that timing with the customer before accepting the purchase order.

originals of the sales contracts were stored at the Mark sales office, with copies sent to the customer as well as to Hartney's accounting department in Forest View. The price for some long-term purchase order customers did not include freight. These customers often hired a common carrier to retrieve their fuel from a Hartney terminal. In some cases, the common carrier selected by the customers was ETI.

¶ 15                                    Past Audits

¶ 16     Between 1990 and the present appeal, IDOR audited Hartney's operations eight times. Five of those audits covered periods during which Hartney had a sales office separate from its Forest View headquarters.

¶ 17     In 1998, IDOR audited Hartney's payment of both retailers' occupation tax (ROT) and motor fuel tax (MFT) in connection with Hartney's sales out of its Du Page County office. In connection with that audit, Joseph Stratman, an agent with IDOR's Bureau of Criminal Investigations, visited Hartney's sales office in Du Page County. Stratman concluded that Hartney was accepting orders in Du Page County and thus subject to the Du Page County MFT.

¶ 18     The auditor, having consulted Stratman, concluded that all orders were accepted in Du Page County and thus agreed that Hartney was subject to Du Page County MFT. Hartney and IDOR litigated the assessment. While both agreed that Hartney's sales were accepted at the Du Page County sales office, Hartney interpreted the Du Page County MFT as applying to sales made only to locations within Du Page County. IDOR, however, interpreted the Du Page County MFT as being a point-of-acceptance tax like the ROT. As a result of finding that Hartney accepted all purchase orders at its sales office in Du Page County, IDOR levied a $3 million assessment against Hartney.

¶ 19     In late 1998, Hartney moved its sales office to La Salle County–a county that did not charge additional MFT on any sales. Hartney operated its sales office in La Salle County in substantially the same manner in which it had operated its sales office in Du Page County. IDOR sent an individual to the La Salle County office to investigate Hartney's La Salle County sales operations. In 2001, the IDOR audited Hartney's payment of ROT over the period of September 1, 1998 to August 31, 2001. The audit produced no adjustments, finding that all sales during the applicable period occurred in La Salle County.

¶ 20                                   Current Audit

¶ 21     In August 2003, Hartney opened the Mark sales office, which operated in the same manner as had the La Salle and Du Page County offices.[3] Hartney reported that substantially all of its fuel sales occurred in Mark. Shortly after Hartney moved to Mark, IDOR sent a representative to visit the Mark sales office. That representative asked a number of questions regarding how Hartney's sales agent in Mark performed her duties. The representative

_____

[3]Hartney's final move from La Salle County to Mark was the result of La Salle County raising its sales tax rate by 0.25%.

witnessed the sales agent accept a purchase order on behalf of Hartney then left and did not return.

¶ 22    IDOR audited Hartney from January 1, 2005, until June 30, 2007. Gerise Ricard was assigned to the Hartney audit. Ricard completed an audit history worksheet, and she and her supervisor, Robert Szymanski, also prepared an audit narrative setting out the bases for the IDOR's audit conclusion. In conducting Hartney's audit, Ricard did not review any of Hartney's past audit files. Neither Ricard nor anyone else from IDOR ever visited the Mark sales office or spoke to any of the individuals who worked in that office in connection with the audit. In May 2008, as the audit was nearing its completion, IDOR destroyed the prior audit files relating to its investigations of Hartney.

¶ 23    Ricard ultimately determined, based on nine audit conclusions, that Hartney's sales were attributable to Forest View, not Mark. As a result, on September 5, 2008, IDOR issued a notice of tax liability (NTL) for the 2005-07 audit period. The NTL reflected Forest View's 1% ROT rate, Cook County's 0.75% ROT rate, and the Regional Transportation Authority's (RTA) 0.75% ROT rate, as well as interest and penalties, for a total of $23,111,939.11 (the disputed tax).

¶ 24                              Procedural History

¶ 25    Hartney paid the disputed tax under protest. On November 7 and 17, 2008, Hartney initiated two lawsuits (cases No. 08 MR 13 and No. 08 MR 15) pursuant to the State Officers and Employees Money Disposition Act (Protest Monies Act) (30 ILCS 230/2a.1 (West 2008)). The first of these cases related to the disputed tax, and the second to IDOR's refusal–starting in the fall of 2008–to remit the local portion of Hartney's tax payments to Mark and Putnam County. Earlier, on October 3, 2008, the board of commissioners of Putnam County and the board of trustees of the Village of Mark had filed suit (case No. 08 MR 11) seeking relief from IDOR's refusal to remit the local portion of Hartney's tax payments to those entities. The three cases were consolidated on February 9, 2009.

¶ 26    After a bench trial, the trial court issued judgment in favor of plaintiffs. The court held that plaintiffs showed by a preponderance of the evidence that (1) Hartney's daily purchase orders "were completed and accepted at its dedicated sales office in Mark, Illinois," and (2) the long-term purchase orders "became binding upon execution and return to the Mark sales office, whether signed first or later signed in Mark by President Peter Hartney." Additionally, the court found that IDOR had violated its common law duty to preserve the prior audit records that it had destroyed and therefore permitted plaintiffs to argue a negative inference from IDOR's failure to produce the records of the previous audits.

¶ 27    Regarding the audit itself, the court determined that "the audit process was, in several determinative aspects, flawed, incomplete, factually unsupported, and legally in error." Ultimately, the court stated that "the subject audit was premised upon incomplete, factually wrong, and legally misunderstood findings, but for which the audit result would likely have favored [Hartney's] continued and previously condoned practice of operating a separate dedicated sales office in a tax venue of its choice." Specifically, the court stated:

    "Plaintiffs' evidence overcomes any presumptive correctness of the Department's

-6-

assessment by competent, credible evidence, and proves Plaintiffs' opposite conclusions by greater than a preponderance of the evidence.

    \*\*\* Plaintiffs have proven by greater than a preponderance of the evidence that [Hartney's] daily and long term sales throughout the subject audit period, were sitused and taxable at its dedicated sales office located in the Village of Mark, County of Putnam, Illinois. Accordingly, it is the judgment of this Court that Plaintiffs are entitled to release and disbursement of applicable taxes, reimbursement to them of sums paid under protest, and abatement or refund of interest and penalties previously assessed, to the extent consistent with this judgment."

¶ 28                                                    ANALYSIS

¶ 29                                          Standard of Review

¶ 30     As the trial court correctly observed, the instant case does not involve administrative review.[4] Instead, the claims were filed pursuant to the Protest Monies Act (30 ILCS 230/1 *et seq.* (West 2010)), which allows a taxpayer to seek judicial determination of a tax dispute, as an alternative to exhausting its administrative remedies and pursuing judicial review by way of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)). Stated another way, the Protest Monies Act allows a taxpayer willing to pay under protest to avoid the administrative protest procedures provided by Illinois law.

¶ 31     The Protest Monies Act provides a mechanism for a party to challenge the propriety of its required payment of money to the State of Illinois. 30 ILCS 230/1 *et seq.* (West 2010). To do so, the party must tender the money under protest. 30 ILCS 230/2a (West 2010). The recipient of funds paid under protest must then notify the Treasurer of the State of Illinois (30 ILCS 230/2a (West 2010)), who then places the money in a special fund known as the protest fund (30 ILCS 230/2a (West 2010)). Thirty days after payment, the money may be transferred out of the protest fund and deposited into the fund in which it would have been placed had there been payment without protest, unless the party making the payment under protest has filed a complaint and secured a temporary restraining order or a preliminary injunction restraining the transfer of the money. 30 ILCS 230/2a (West 2010). Once a temporary restraining order or preliminary injunction is issued, the money must remain in the protest fund until the final judgment of the trial court. 30 ILCS 230/2a (West 2010).

¶ 32     The supreme court has yet to identify what standard applies when a trial court is faced with a specific claim brought pursuant to the Protest Monies Act. The parties, however, appear to agree that the trial court below applied the correct standard when examining the merits of the instant case. The court stated:

    "Plaintiffs bear the burden of proof by a preponderance of the evidence as to each cause of action alleged. The State defendants begin with a *prima facie* advantage, being entitled to a rebuttable presumption of accuracy as to IDOR's audited assessment provided the same is shown to have met minimum standards of reasonableness premised

---

[4]The parties acknowledge this case does not involve administrative review.

upon its best judgment. As Plaintiffs have the ultimate burden of proof, however, that burden requires Plaintiffs to necessarily overcome the State defendants' *prima facie* presumption of correctness. If that presumption is indeed overcome, Plaintiffs must still proceed to meet their burden of proof, which the State may seek to rebut by not only meeting 'minimum standards' or using 'best judgment,' but with the loftier goal of being right. The parties accurately point out that this is not an administrative review in which fact issues would be determined on the basis of whether an agency ruling was contrary to the manifest weight of the evidence before it. To the contrary, this Court is to weigh the evidence to determine whether Plaintiffs have met their burden as above-stated."

¶ 33    Because the parties appear to agree that the trial court below applied the correct standard we offer no opinion on this issue. Our discussion of the applicable standard is for the sole purpose of giving context to the trial court's factual findings and its ultimate disposition.

¶ 34    On appeal, we apply a dual standard of review. We review legal issues *de novo* and factual issues under a manifest weight of the evidence standard. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 153 (2005). We note that the supreme court has only applied the clearly erroneous standard to decisions of administrative agencies. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 542 (2007). It has expressly chosen to apply the above dual standard "[i]n all other civil cases." *Samour*, 224 Ill. 2d at 542.

¶ 35                                   Statutory Law

¶ 36    The issue in the present case is whether the trial court erred in finding that Hartney's daily and long-term sales throughout the subject audit period were sitused and taxable at its dedicated sales office located in the Village of Mark, County of Putnam, Illinois. The trial court correctly explained that there are three relevant sections of title 86 of the Administrative Code, which involve levying local sales taxes: (1) one section permitting a home rule county to levy its own ROT (86 Ill. Adm. Code 220 *et seq.*), (2) another permitting a home rule municipality to levy its own ROT (86 Ill. Adm. Code 270 *et seq.*), and (3) a third specifically permitting the regional transit authority to levy its own separate ROT (86 Ill. Adm. Code 320 *et seq.*).[5]

¶ 37    For a seller to incur the relevant ROT in a given county, municipality or metropolitan region, the sale must be made in the course of such seller's engaging in the retail business within the county, municipality or metropolitan region. See 86 Ill. Adm. Code 220.115(b)(1), 270.115(a)(1), 320.115(a)(1) (2000). In other words, enough of the selling activity must occur within the county, municipality or metropolitan region to justify concluding that the seller is engaged in business within the county, municipality or metropolitan region with respect to that sale. See 86 Ill. Adm. Code 220.115(b)(1), 270.115(a)(1), 320.115(a)(1) (2000). The above authority can be found in each of the three relevant sections under the respective subsection entitled, "Mere Solicitation of Orders Not Doing Business." See 86 Ill. Adm. Code 220.115(b), 270.115(a), 320.115(a) (2000).

---

[5]These three regulations are nearly parallel. Any minor distinctions do not impact the result of this appeal.

¶ 38    Each of the above three sections expressly provides that "the seller's acceptance of the purchase order or other contracting action in the making of the sales contract is the most important single factor in the occupation of selling." See 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(1), 320.115(b)(1) (2000). Specifically, section 220.115(c)(1) states:

> "c) Seller's Acceptance of Order
>
>     1) Without attempting to anticipate every kind of fact situation that may arise in this connection, it is the Department's opinion, in general, that the seller's acceptance of the purchase order or other contracting action in the making of the sales contract is the most important single factor in the occupation of selling. If the purchase order is accepted at the seller's place of business *within the county* or by someone who is working out of that place of business and who does not conduct the business of selling elsewhere within the meaning of subsections (g) and (h) of this Section, or if a purchase order that is an acceptance of the seller's complete and unconditional offer to sell is received by the seller's place of business *within the home rule county* or by someone working out of that place of business, the seller incurs Home Rule County Retailers' Occupation Tax liability in that home rule county if the sale is at retail and the purchaser receives the physical possession of the property in Illinois. The Department will assume that the seller has accepted the purchase order at the place of business at which the seller receives the purchase order from the purchaser in the absence of clear proof to the contrary." (Emphases added.) 86 Ill. Adm. Code 220.115(c)(1) (2000).

Section 270.115(b)(1) states:

> "b) Seller's Acceptance of Order
>
>     1) Without attempting to anticipate every kind of fact situation that may arise in this connection, it is the Department's opinion, that the seller's acceptance of the purchase order or other contracting action in the making of the sales contract is the most important single factor in the occupation of selling. If the purchase order is accepted at the seller's place of business *within the municipality* or by someone who is working out of such place of business and who does not conduct the business of selling elsewhere within the meaning of subsections (f) and (g) of this Section, or if a purchase order which is an acceptance of the seller's complete and unconditional offer to sell is received by the seller's place of business within the home rule municipality or by someone working out of such place of business, the seller incurs Home Rule Municipal Retailers' Occupation Tax liability in that home rule municipality if the sale is at retail and the purchaser receives the physical possession of the property in Illinois." (Emphasis added.) 86 Ill. Adm. Code 270.115(b)(1) (2000).

Section 320.115(b)(1) states:

> "b) Seller's Acceptance of Order
>
>     1) Without attempting to anticipate every kind of fact situation that may arise in this connection, it is the Department's opinion, in general, that the seller's acceptance of the purchase order or other contracting action in the making of the sales contract

-9-

is the most important single factor in the occupation of selling. If the purchase order is accepted at the seller's place of business *within the metropolitan region* or by someone who is working out of such place of business and who does not conduct the business of selling elsewhere within the meaning of subsections (f) and (g) of this Section, or if a purchase order which is an acceptance of the seller's complete and unconditional offer to sell is received by the seller's place of business within the metropolitan region or by someone working out of such place of business, the seller incurs Regional Transportation Authority Retailers' Occupation Tax liability in the metropolitan region if the sale is at retail and the purchaser receives the physical possession of the property in Illinois." (Emphasis added.) 86 Ill. Adm. Code 320.115(b)(1) (2000).

¶ 39  Each of the above three sections also provides that under a long-term purchase order agreement which must be implemented by the purchaser's placing specific orders when goods are wanted, the seller's place of business with which subsequent orders are placed (rather than the place where the seller signed the master contract) will be determinative of the sales situs. See 86 Ill. Adm. Code 220.115(e), 270.115(d), 320.115(d) (2000). Delivery of the property within the county, municipality or metropolitan region is not necessary to incur the relevant ROT. See 86 Ill. Adm. Code 220.115(d)(1), 270.115(d), 320.115(d) (2000).

¶ 40                                            ROT Liability

¶ 41  Initially, defendants challenge the trial court's interpretation of the above sections. Specifically, the court found that ROT liability is determined according to where acceptance of the purchase orders took place. The interpretation of a statute presents a question of law that this court reviews *de novo*. *Corral*, 217 Ill. 2d at 153.

¶ 42  While defendants concede that the seller's acceptance of the purchase order is "the most important single factor" in determining ROT liability, they call our attention to the fact that the above sections do not expressly provide that it is the only factor. Therefore, defendants assert that ROT liability should be determined only after considering a plethora of selling activities, including where fuel prices were set, where price sheets were sent to customers, where credit decisions were made, where specific customer decisions were made and where the timing of deliveries was determined. Ultimately, defendants argue there was not "enough" selling activity in Mark to justify the trial court's finding that Mark was the relevant ROT jurisdictions.

¶ 43  As noted above, the subsection, entitled "Mere Solicitation of Orders Not Doing Business," is found in each of the three relevant sections. See 86 Ill. Adm. Code 220.115(b), 270.115(a), 320.115(a) (2000). Again, this subsection expressly provides that enough of the selling activity must occur within the county, municipality or metropolitan region to justify concluding that the seller is engaged in business within the county, municipality or metropolitan region with respect to that sale. See 86 Ill. Adm. Code 220.115(b)(1), 270.115(a)(1), 320.115(a)(1) (2000). We find this language establishes a minimum threshold for making sales activity *potentially* subject to ROT liability. We view this language as

-10-

similar to the concept used by courts when faced with the personal jurisdictional issue of whether the requisite minimum contacts exist to establish jurisdiction over a party.

¶ 44　　The "Mere Solicitation of Orders Not Doing Business" subsection makes clear that a sale cannot be taxed in any given jurisdiction unless enough of the seller's selling activity occurs within that jurisdiction. This policy is analogous to the personal jurisdictional policy that a party cannot be haled into court in a specific jurisdiction absent sufficient contacts. See *Duncan v. Duncan*, 94 Ill. App. 3d 868, 870 (1981) (determining that defendant did not have sufficient contacts with Illinois for purposes of personal jurisdiction where parties were married in Illinois and briefly lived in Illinois after marriage but then moved to Virginia and had no contact thereafter with Illinois). While this subsection expressly protects a person or business from being unfairly subjected to ROT liability, it does not set out the applicable test (or in the parallel personal jurisdiction context–what constitutes sufficient contacts) for determining the situs for ROT liability. That applicable test is found in the following subsection, entitled "Seller's Acceptance of Order."

¶ 45　　The "Seller's Acceptance of Order" subsection, which can be found in each of the three relevant sections, creates a bright-line test: where acceptance occurs, ROT liability is fixed. See 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(1), 320.115(b)(1) (2000). Only two conditions are placed upon this mandate: (1) the sale must be at retail, and (2) the purchaser must receive physical possession of the property in Illinois. See 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(1), 320.115(b)(1) (2000).

¶ 46　　Defendants fail to cite any relevant authority supporting their claim that ROT liability should be determined only after considering a plethora of selling activities, including where fuel prices were set, where price sheets were sent to customers, where credit decisions were made, where specific customer decisions were made and where the timing of deliveries was determined. Such a position is contrary to the express language of the "Seller's Acceptance of Order" subsection. We therefore do not consider any of these factors when determining where ROT liability should be fixed.

¶ 47　　The primary objective of statutory interpretation is to ascertain and give effect to the intent of our legislature. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 320 (2003). "This inquiry 'must always begin with the language of the statute, which is the surest and most reliable indicator of legislative intent.' " (Internal quotation marks omitted.) *People v. Marshall*, 242 Ill. 2d 285, 292 (2011) (quoting *People v. Pullen*, 192 Ill. 2d 36, 42 (2000)). We construe the statute as a whole and afford the language of the statute its plain and ordinary meaning. *Rogers*, 204 Ill. 2d at 320. "Where that language is clear and unambiguous, we must apply the statute without further aids of statutory construction." *Marshall*, 242 Ill. 2d at 292.

¶ 48　　We afford the "Seller's Acceptance of Order" subsection its plain and ordinary meaning: If Hartney accepted the daily and long-term purchase orders in Mark, then the applicable ROT liability is fixed in Mark. Moreover, we find that acceptance of the daily and long-term purchase orders would satisfy the minimum "selling activity" requirement found in the "Mere Solicitation of Orders Not Doing Business" subsection.

¶ 49　　The dissent generically cites the Fourth District Appellate Court's decision in *Chemed*

*Corp. v. State*, 186 Ill. App. 3d 402 (1989), as authority for its proposition that "a totality of the circumstances test" applies when determining the situs for ROT liability (*infra* ¶ 63). Initially, we note that we are not bound by decisions of sister districts. *Schramer v. Tiger Athletic Ass'n*, 351 Ill. App. 3d 1016, 1020 (2004).

¶ 50    Unlike *Hartney*, the seller in *Chemed Corp.* did not have a business office in Illinois. No offers were accepted in Illinois. Instead, all offers were accepted at the seller's business office in Ohio. The seller did, however, have a warehouse in Illinois, which it used as a base of operation for its Illinois sales. Specifically, goods would be shipped from the Illinois warehouse after acceptance of an order in Illinois.

¶ 51    The seller filed claims for refunds of money it paid in relation to additional municipal ROT and authority ROT liability. In reversing the trial court's decision, the Fourth District found the seller liable because the seller was attempting to evade ROT liability altogether and the additional taxes were within the scope of the applicable ROT acts (Ill. Rev. Stat. 1987, ch. 120, ¶ 441; Ill. Rev. Stat. 1987, ch. 111 2/3, ¶ 704.03(e)). Specifically, the court stated:

> "We believe the regulations the Department has enacted are within the scope of their corresponding acts. The regulations recognize the business of retail selling can involve a variety of activities, and therefore they do not attempt to provide a complete list. Mere solicitation is not enough and the focus must be on the occupation of selling, not where the goods are to be consumed or where a title passes. The regulations put great emphasis on the place the purchase order is accepted, but overrides that factor as follows:

>> 'Regardless of the place at which the purchase order is accepted, where tangible personal property is located within a municipality at the time of its sale (or is subsequently produced in Illinois), then delivered in Illinois to the purchaser, *** the place where the property is located at the time of the sale (or subsequent production in Illinois) will determine where the seller is engaged in business for [MROT] purposes with respect to such sale.' 86 Ill. Adm. Code § 270.115(b)(3) (1985).

> In adopting the language of section 270.115(b)(3), the Department was asked the following question by the joint committee on administrative review:

>> 'How are the out-of-state vendors engaged in the business of selling tangible personal property at retail in a particular county or municipality when they are neither located nor sell their products in that municipality or county and the only connection to that county or municipality is that the product happens to be located, stored, or produced in that county or municipality?'

> The Department, as shown by a memorandum in the record, responded:

>> '[T]his rule will eliminate a competitive advantage enjoyed by out-of-state vendors who produce or warehouse their product in a municipality or county in Illinois but are immune from the municipal or county retailers' occupation tax since they are neither located nor sell their products in the particular municipalities or counties. The Department believes that persons may be "engaged in the business of selling tangible personal property" in a municipality or county, even though the order is taken at a location outside the state, when the goods are stored or produced in an Illinois county or municipality and subsequently delivered within Illinois. *This would appear to be*

*a reasonable interpretation of the statutory language*.' " (Emphasis in original.) *Chemed Corp.*, 186 Ill. App. 3d at 417-18.

¶ 52       While the Fourth District appears to support defendants' argument in the instant case that the absence of "a complete list" in the "Seller's Acceptance of Order" subsection (*Chemed Corp.*, 186 Ill. App. 3d at 417) justifies application of a totality of the circumstances test, we note that such an interpretation renders the exception found in section 270.115(b)(3) superfluous. If a totality of the circumstances test were the *de facto* test, there would be no justifiable need to create an exception for when a seller's acceptance is consummated outside of Illinois. Instead, one would just analyze the totality of the circumstances. Thus, we believe the existence of the exception found in section 270.115(b)(3) actually supports our interpretation that acceptance governs ROT liability.

¶ 53       Moreover, we again stress the plain language found in the "Seller's Acceptance of Order" subsection: If the purchase order is accepted at the seller's place of business within the county, municipality and/or metropolitan region; ROT liability is fixed in that respective county, municipality and/or metropolitan region. See 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(1), 320.115(b)(1) (2000). The dissent and defendants would have us ignore this plain language and instead apply a test that is neither articulated or defined by a "complete list" or express factors. We refuse to create such legal fiction.

¶ 54                                   Did Hartney Accept in Mark?

¶ 55       Defendants next challenge the trial court's factual findings that Hartney accepted both daily purchase orders and long-term purchase orders in Mark. This court will not disturb these factual findings unless they are against the manifest weight of the evidence. *Samour*, 224 Ill. 2d at 542. In light of this standard, we set out the trial court's express findings:

                     "DAILY PURCHASE TRANSACTIONS

               The Plaintiffs' evidence proves by a preponderance of the evidence that Hartney fuel sales transactions were completed and accepted at its dedicated sales office in Mark, Illinois during and beyond the subject audit period. Daily purchase order customers, having been provided bid pricing information and having the option of purchasing fuel from Hartney or elsewhere, could choose to purchase from Hartney. To do so, daily purchase order customers were directed to place their orders for Hartney products with its sales representative at its designated sales office in Mark, Illinois. Testimony established that any calls to Hartney's Forest View office would have been redirected to Mark. The agreement with Putnam County Painting as managing sales agent, was to provide a sales representative to receive, accept and process fuel purchase orders from Hartney customers.

               Defendants note that credit decisions were made in Forest View and were not within the discretion of personnel in Mark. Though credit approval of new daily customers would generally take place at Hartney's Forest View office, no such activity occurred during the subject period. The sales representative was pre-advised as to approved customers, so that each order could be accepted by that representative without having to check or approve the extension of credit to the customer. The evidence proves by

preponderance that each sale was completed upon acceptance of the purchase order by the sales representative at Hartney's sales office in Mark and that no further approval, credit check, or confirmation was required or obtained from Hartney's Forest View office. By operation of basic contract law, Hartney's sales agent's unconditional acceptance of each purchase order completed each sale transaction, binding the principal to sell on the terms and conditions recorded. Upon receiving such purchase orders by call or fax, and having been previously informed as to whether the customer's credit was pre-approved, the sales representative would receive order information as to the type of products to be purchased, the tank numbers and quantities, day and time specified for delivery, the name of the person placing the order, and the customer's purchase order or reference number if needed for billing purposes.

As to each completed transaction, the sales representative in Mark contacted ETI as the designated common carrier, in Forest View, to effect delivery. The evidence establishes that, although Hartney's business offices and ETI's dispatch and operational offices shared the Forest View facilities, the two entities were separate corporations with separate corporate identities and separate business functions. As was the practice with past sales representatives in Elmhurst, Burr Ridge and Peru, the sales representative in Mark was required to speak to ETI President Gary Hartney, in his capacity as ETI dispatcher, or to 'Kevin' as dispatch manager, *** to effect delivery. Gary Hartney relied upon the fact that delivery orders were pursuant to completed sale transactions without having to confirm or discuss the order with Hartney personnel. If the occasion arose that a customer required immediate delivery, the sales representative would call Gary Hartney to confirm the availability of the common carrier to deliver on request; neither the sales representative nor ETI would have to check or confirm sale approval with Hartney personnel. The evidence establishes that Hartney's billing, payroll and accounting personnel in Forest View were not associated with or involved in Hartney's daily sales. Following delivery, ETI would advise Hartney's billing department to then invoice the customer. Gary Hartney testified that separate individuals were responsible for entering each entity's billing record.

***

LONG TERM PURCHASE TRANSACTIONS

With respect to long term contract customers, it has been shown by a preponderance of the evidence that such contracts became binding upon execution and return to the Mark, Illinois sales office, whether signed first or later signed in Mark by Hartney President Peter Hartney. It is further demonstrated that the process during the relevant period required that such contracts be returned to and retained in Hartney's Mark sales office. Plaintiffs' evidence further proves by a preponderance of the evidence that deliveries made pursuant to Hartney's long term contracts did not require the placing of 'orders' but instead relied on the common carrier (such as ETI) to meet their requirements by keeping their tanks full, or otherwise meeting their fuel requirements, upon the terms set forth in each long term contract. These contracts were serviced by the common carrier without intervention, notation or approval of Hartney personnel. The common carrier, after delivery, would advise Hartney to invoice the customer. As with

daily purchase orders, Hartney's personnel in Forest View had no customer contact other than to invoice for fuel delivered and documented by the common carrier, whether ETI or any other firm designated by the customer for the delivery of fuel."

¶ 56    We cannot say that the trial court's factual findings that Hartney accepted both daily purchase orders and long-term purchase orders in Mark were against the manifest weight of the evidence. We reject defendants' contention that "Mark was the point of contract 'acceptance' in name only." The record reveals that Hartney entered into an agreement with Putnam Painting in 2003 that vested Putnam Painting and its employees with the explicit authority to "receive, accept and process" purchase orders on behalf of Hartney. The record confirms that all daily purchase orders were *accepted* in Mark. The record also confirms that all long-term purchase orders were *accepted* in Mark. Consequently, ROT liability is fixed in Mark.

¶ 57    In coming to this conclusion, it seems clear to us that Hartney has intentionally structured its sales locations and procedures in a deliberate attempt to minimize its tax liability. We find no indication in the statutory authority before us or in the Administrative Code of legislative intent to prohibit such business decisions. Nor does it appear, after a review of the record presented to us, that past decisions by the IDOR have attempted to punish Hartney for its previous efforts to minimize its costs of doing business by implementation of the same sales practices employed in Mark or to require its ROT payments to benefit any municipal entity other than the one(s) in which its sales office is currently located.

¶ 58    We note in this regard that prior IDOR audits might have shed additional light on its decisional history, but they were destroyed by the agency after the filing of this lawsuit. Their only relevance in this litigation is the fact that the trial court allowed Hartney to argue a negative inference from the State's failure or inability to produce prior audit evidence at trial. The audits are not part of our record, we have not been able to review them, the parties strongly disagree on their content and import, and our standard of review as to factual issues is not *de novo*. For these reasons, the previous audits have not factored in any way into the panel's decision.

¶ 59    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 60    Affirmed.

¶ 61    JUSTICE CARTER, dissenting.

¶ 62    I respectfully disagree with the majority's conclusion in the present case. Unlike the majority, I would find that the trial court erred in determining that Hartney's situs was in Mark for the purpose of the retailers' occupation taxes (ROTs) and in entering judgment in favor of plaintiffs on that basis. I would, therefore, reverse the trial court's ruling and remand this case for the trial court to enter judgment in favor of defendants.

¶ 63    Neither the statutes nor the regulations involved in this case specifically define the phrase "engaged in the business of selling." The regulations make clear, however, that a totality of the circumstances test applies. See 86 Ill. Adm. Code 220.115(b) to (e), 270.115(a) to (d),

320.115(a) to (d) (2000); *Chemed Corp. v. State*, 186 Ill. App. 3d 402, 415-17 (1989). Thus, under the regulations, for a seller to be liable for ROTs to a particular taxing jurisdiction, enough of the seller's selling activity must occur within that jurisdiction to justify concluding that the seller is engaged in business within that jurisdiction with respect to that sale. 86 Ill. Adm. Code 220.115(b)(1), 270.115(a)(1), 320.115(a)(1) (2000); *Chemed Corp.*, 186 Ill. App. 3d at 415. Mere solicitation of orders within the taxing jurisdiction in not enough. 86 Ill. Adm. Code 220.115(b), 270.115(a), 320.115(a) (2000); *Chemed Corp.*, 186 Ill. App. 3d at 415-17. The most significant factor in determining a seller's situs for ROTs is the location of the seller's acceptance of the purchase order, although that factor alone may not be dispositive. See 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(1), 320.115(b)(1) (2000); *Chemed Corp.*, 186 Ill. App. 3d at 415-17. In the absence of clear proof to the contrary, it is generally assumed that acceptance of the purchaser order takes place at the place of business where the seller receives the purchase order. 86 Ill. Adm. Code 220.115(c)(1), 270.115(b)(2), 320.115(b)(2) (2000).

¶ 64    In addition, in considering the definition of the phrase "engaged in the business of selling," the Illinois Supreme Court stated:

> "An occupation, the business of which is to sell tangible personal property at retail, is the composite of many activities extending from the preparation for, and the obtaining of, orders for goods to the final consummation of the sale by the passing of title and payment of the purchase price. It is obvious that such activities are as varied as the methods which men select to carry on retail business and it is therefore not possible to prescribe by definition which of the many activities must take place in Illinois to constitute it an occupation conducted in this State. Except for a general classification that might be made of the many retail occupations, it is necessary to determine each case according to the facts which reveal the method by which the business is conducted." *Ex-Cell-O Corp. v. McKibbin*, 383 Ill. 316, 321-22 (1943).

Thus, it is clear from the supreme court's discussion that the term must be evaluated on a case by case basis. See *Ex-Cell-O Corp.*, 383 Ill. at 321-22.

¶ 65    In the present case, the evidence showed that virtually all of the sales activity took place at Hartney's main office in Forest View. The Mark "sales" office was created in an attempt to avoid paying the additional ROTs. The Mark office merely served as a mailbox and a fax line for Hartney, where an order-taker would take the orders from customers and fax those orders to the main office in Forest View. As to the daily purchase orders, the order-taker in Mark did not negotiate the sales, had no authority to approve financing, and was not even aware of the prices of the fuel being sold. Furthermore, as to the blanket orders, the order-taker in Mark had almost no connection to those sales whatsoever. Under these circumstances, I would conclude that Hartney's situs for ROTs was the Forest View office. See *Marshall & Huschart Machinery Co. v. Department of Revenue*, 18 Ill. 2d 496, 501-02 (1960) (ROT liability upheld where seller had merely created a complicated subterfuge to avoid the application of the ROT). In my opinion, the trial court erred in reaching the opposite conclusion.

¶ 66    For the reasons stated, I respectfully dissent from the majority's opinion.